of the house; there is no railing or fence to guard the area from the street; the plaintiff passing by in a dark night, fell in, and had his arm broken.

The defence set up was that the premises had been exactly in the same situation as far back as could be remembered, and many years before the defendant was in possession of them. But *Lord Ellenborough* held:

"That however long the premises might have been in this situation, as soon as the defendant took possession of them, he was bound to guard against the danger to which the public had been before exposed, and that he was liable for the consequences of having neglected to do so, in the same manner as if he himself had originated the nuisance. That the area belongs to the house, and it is a duty which the law casts upon the occupier of the house to render it secure."

The case of *Coupland vs. Hardingham*, which we have just cited from 3 *Campb.* 398, is similar in all its features to the one at bar, and we consider unnecessary to add a single word to the reasoning of *Lord Ellenborough* upon this subject. We think the ruling of the court below was correct upon all the points raised by the defendant's prayers, and that their judgment must be affirmed.               JUDGMENT AFFIRMED.

---

WILLIAM C. CUNNINGHAM AND OTHERS *vs.* GEORGE SCHLEY AND OTHERS.—*December*, 1847.

It is not necessary for a trustee, in his published notice of sale under a decree, to state the names of the parties to the suit in which the decree was passed; nor the several deeds creating incumbrances on the property offered for sale.

A decree directed that the real estate of *J.* deceased, in the proceedings mentioned, or so much as may be necessary to pay his debts, be sold; and although it does not say in terms, that the title of the parties to the suit should be sold, still a sale under the decree would pass such title.

A notice of sale, which states that by virtue of a decree of the Court of Chancery, there will be sold certain real estate, naming the tracts, giving their locality, of which *J.* died seized and possessed, is a notice that there must

be parties to the decree,—and in the absence of evidence, that competition in the purchase was prevented by the character of the notice, or that the sale was, in any respect, prejudiced thereby: a sale under such notice should not be vacated.

A defendant in a cause, under such a decree, cannot object that the trustee did not, in fact, sell the interest of the parties to the suit, but only of one of them. Such an objection might come from a purchaser, who is alone injured by it.

Where a defendant, whose title is decreed to be sold, knows of any fact which would disperse a cloud on the title decreed to be sold, and omits to communicate it to the trustee in due time, it does not become him, when a sale has been made, to interpose it as an objection to the ratification of sale against purchasers.

When a sale is objected to on the ground of inadequacy of price, which may be traced to doubts, about the title, it becomes material to inquire, whether the trustee might not, by reasonable efforts, have removed the cloud.

Where, from the nature of the doubt, no diligence on the part of the trustee could remove it, he may proceed to a sale, and the parties may refer its solution to the judgment of the court

Where a sale reported was of a private sale, made for a much larger sum than could be obtained at an offer at public sale, duly made by a trustee, inadequacy of price is no objection to the private sale.

An event which happens subsequent to a reported sale, and which, in the opinion of many persons, has enhanced the value of the property sold, ought not to affect such reported sale.

In *Andrews vs. Scotton,* 2 *Bland,* 643, it was decided, " that if a trustee directed to sell by decree at a public sale, sell, at private sale, the sale will be confirmed, if satisfactory reasons are given for so doing, and *no objection is made.*" These latter words mean *objections of sufficient force,* to outweigh the reasons given by the trustee for deviating from the terms of the decree.

Where a trustee did not undertake to sell at private sale until a fruitless effort had been made at public sale, according to the terms of the decree, and even after such failure kept the property in the market by advertisements offering it at private sale, and procured a greater price at private than he had been offered at public sale—the court will *not* consider his conduct a substantial deviation from the decree, but only one offered from necessity.

Chancery will ratify an act when done, which upon a previous application, would have been ordered.

Whilst the Chancellor would consider it his duty to vacate sales made by officers of his appointment, under the influence of error, fraud, misrepresentation, or injurious mistake, still it would be fatal policy to be astute in finding out objections to them.

Where a trustee's bond is not stamped, but was filed and approved by the Chancellor, and the trustee proceeded to make the sale as decreed—this is not a ground for vacating the sale; but the Chancellor, on application, will require the trustee to file a new bond.

APPEAL from the Court of Chancery.

The bill was filed on the 6th December, 1842, by *Robert M. Gibbes* and others, creditors of *James Cunningham*, deceased, against his heirs-at-law and others, for a sale of his real estate for payment of his debts. It, amongst other things, stated that *Cunningham*, in his life-time, on the 21st October, 1835, conveyed to *Henry Wayman*, (one of the defendants,) certain of his lands in trust; but that said trustee has altogether neglected and refused to execute the trust, or sell the property conveyed to him.

*Wayman*, by his answer, admitted the conveyance to him in trust as stated; but averred "that he has not sold the land, because he was unable to obtain any thing like its value, and no one interested in the same has urged a sale, which would have been a sacrifice of it."

The answers of the other defendants are immaterial. A commission was issued to take testimony, under which the complainants proved their case. And a decree was passed on the 13th April, 1846, "that the real estate of *James Cunningham*, deceased, in the proceedings mentioned, or so much thereof as may be necessary for the payment of his debts, be sold; that *George Schley*, of *Washington* County, be appointed trustee to make such sale, whose course and manner of proceeding shall be as follows," &c. The trustee bonded accordingly.

On the 17th June, 1847, the trustee reported, after giving notice of the time, place, manner and terms of sale, " by advertisement in the '*Alleganian* and *Civilian*'" newspapers, printed at *Cumberland*; the "*Torchlight*," a newspaper printed at *Hagerstown*, and the "*Patriot*," a newspaper printed at *Baltimore*, for more than three successive weeks before the day of sale; he did, pursuant to said notice, attend at *Cumberland* on Tuesday, the 8th September, 1846, and proceed to offer said real estate for sale; that he was notified of a claim of title to "*Latent Worth*," one of the tracts of land embraced by the decree, arising by virtue of a purchase of the same at

collector's sale; that he then received, as a bid for the same, the sum of five cents per acre ; and that all efforts, at an advance upon said bid, failing, your trustee refused to sell; that the sum of six cents per acre was offered for "*Glen Eyry,*" and the sum of twenty-six cents per acre for another tract, called "*Muddy Creek,*" and that no advance could be had upon said bids; that your trustee refused to sell at the prices aforesaid, and shortly thereafter offered said lands for sale *at private sale,* by advertisement in the " *Civilian* and *Alleganian,*" two papers printed at *Cumberland;* that although said advertisement has been continued ·in said papers from the period aforesaid to the date of this report, your trustee has received but one proposal for a purchase, which he has accepted by entering into a written contract, herewith filed, with the purchaser, from which it will appear that he has sold the right, title, interest and estate of *James Cunningham,* deceased, in and to the lands mentioned therein, to *Jacob Markell,* of *Frederick,* for the gross sum of $3,000—said sum to be paid in cash upon the purchaser being notified by the trustee of the final ratification of this sale; that said *Markell* is a man of means, and able to meet his engagement to pay at the time stipulated.   The trustee reported briefly, the reasons that induced him to sell so large a number of acres for nominally so small a sum. " He found that he could not sell by the acre, unless he would undertake to have the land surveyed, as the present purchaser refused to be governed by the number of acres expressed in the patents, he having been informed that the area of the said land had been ascertained by calculations based upon reference lines, and not from actual measurement of the land by a survey of the same.   The expense of the survey of so large a body of land, in a county thinly settled, forbade this mode of ascertaining the true quantity of land—your trustee having been informed by a practical surveyor that it would cost $600 or $800.   The claim of title to "*Latent Worth*" added another impediment to a sale by the acre.   The rough and rugged character of these lands, embracing within their area, mountains—their distance from any market—their great length

and poverty of breadth, winding for miles among elder tracts— their present trifling intrinsic, and their very doubtful prospective value, all combined to bring the mind of your trustee to the conclusion, that he could not effect a better sale, and he accordingly concluded the sale now reported. The trustee further reported, that at the time of advertising said sale, he gave notice to the creditors of said *James Cunningham,* deceased, to file their claims, with the vouchers thereof, in, &c. within four months from the day of sale, and he exhibits, as part of this report, a copy of the first said notice of sale, marked T. R. No. 1; also a copy of the said second notice of sale, that with a view of placing all the facts which have come to his knowledge before the Chancellor, he reports that on the 22d December, 1846, a certain *Henry Wayman,* one of the parties to the bill filed in this cause, and a creditor, as he alleges, of said *Cunningham,* deceased, wrote to your trustee, stating that he had received a letter from *Duff Green,* of *Washington* City, inquiring about the lands embraced by the decree in this cause, as he wished to purchase them for a *Northern Company,* and to know the lowest price for them; that he, the said *Wayman* had answered his letter, and fixed the price at fifty cents, which he thought had better be taken, if such a sale could be made by the trustee, or the writer. To this letter your trustee replied, expressing his readiness to receive and consider any proposition for a purchase from said *Green,* and desiring *Mr. Wayman* to so state to *Mr. Green;* from that time until the 24th May, 1847, nothing was heard from said *Wayman* or *Green.* On said day, your trustee received the letter, herewith exhibited, marked T. R. No. 3, and filed as part of this report; also subsequently the letter, herewith filed, marked T. R. No. 4; all which is respectfully submitted to the consideration, and for the further order of the Chancellor.

*Contract of sale filed by Trustee.*

"Articles of agreement made this 15th May, 1847, by and between *George Schley,* trustee for the sale of certain parts

of the real estate of *James Cunningham,* deceased, of the one part, and *Jacob Markell,* of the other part. The said *Schley* hereby agrees to sell to the said *Markell* all the estate, right, title and interest of the said *James Cunningham,* deceased, of, in and to three tracts or parcels of land, viz: " *Glen Eyry,*" " *Latent Worth,*" and "*Muddy Creek,*"—the same being situate in *Allegany* County, in the said State, at and for the price or sum of $3,000—the said sale to be subject to the approval of the said court,—and the said sum of $3,000 to be paid by the said *Markell* upon the ratification of the above sale by the *High Court of Chancery of Maryland.* And the said *Markell,* on his part, hereby agrees to pay the said sum of $3,000, for the interest of the said *Cunningham* in and to the above described lands, upon the ratification of the sale thereof by the *High Court of Chancery of Maryland.* In testimony whereof, the said parties have hereunto set their hands and seals on the day and year first above written.

The said *Schley,* on his part, agrees to execute a good and sufficient deed, conveying the interest, right, title and estate of the said *Cunningham* in and to the above lands, to the said *Jacob Markell,* upon receiving the purchase money thereof, as above stipulated: and as further and more particular description of the above lands, and not as guarantee of their area or contents, it is herein stated that " *Latent Worth*" is supposed to contain ten thousand seven hundred and sixty-one and six-eighths acres of land; "*Glen Eyry,*" four thousand six hundred and twenty-four, and " *Muddy Creek*" five hundred and sixty-five and one-eighth acres of land.

GEO. SCHLEY. [Seal.]

JACOB MARKELL. [Seal.]

### T. R. No. 1.—*Trustee's Sale.*

"By virtue of a decree of the High Court of Chancery of *Maryland, I will offer at public sale,* in the Town of *Cumberland,* on Tuesday, the 8th September next, between the hours of 10 o'clock A. M. and 4 P. M. the following valuable real estate, (or so much thereof as may be necessary for the

payment of debts,) of which *James Cunningham* died seized and possessed, situated in *Allegany* County, in said State.

" No. 1.—A tract of land, called ' *Muddy Creek*,' containing five hundred and sixty-five and a half acres.

" No. 2.—A tract of land, called ' *Glen Eyry*,' containing four thousand six hundred and twenty-four acres.

"No. 3.—A tract of land, called ' *Latent Worth*,' containing ten thousand seven hundred and sixty-one and five-eighths acres.

" These lands lie west of *Cumberland*, at no great distance from the *Western* or *National Turnpike Road*, and form a portion of that country, usually styled ' The *Glades*.' They are admirably adapted to the growth of rye, oats, grass and potatoes, well supplied with water and timber, and are among the best grazing lands in *Maryland*. A more detailed description is deemed unnecessary, as those desirous of purchasing are invited to call on *Mr. William Cunningham*, who resides thereon, and who will shew them to all wishing to view them.

" The terms of the sale prescribed by the decree, are as follows: one third, &c.

" The trustee is directed to convey to the purchaser or purchasers, the property to him or them sold, by a good and sufficient deed.

" The creditors of *James Cunningham*, deceased, are hereby notified to file their claims, with the vouchers thereof, in the Chancery Office, within four months from the above day of sale.                GEO. SCHLEY, *Trustee*."

*August* 15*th.*

### T. R. *No.* 2.— *Trustee's Sale.*

By virtue of a decree of the High Court of Chancery of *Maryland, I will offer at private sale,* (having failed to sell at public sale,) the following valuable real estate, or so much thereof as may be necessary for the payment of debts,) of which James Cunningham died seized and possessed, situate in *Allegany* County in said State, &c. then as in the above notice of sale.

### T. R. No. 3.

*Washington, 24th May, 1847.*

*Sir,*—My father was authorized by *Mr. Wayman* to sell *Cunningham's* lands in *Allegany*—fifteen thousand nine hundred and fifty acres—and has made a sale in conformity with *Mr. Wayman's* instructions. I see by an advertisement in a *Cumberland* paper that you are a trustee, under a decree of the court, to make the conveyance; will you please let me know, by return mail, whether you are prepared to make the conveyance, or whether it must be first ratified by the court, and whether it will be convenient for you to come here to receive the money and make the conveyance.

Your ob't servant,

*George Schley, Esq.*        BEN. E. GREEN.

### T. R. No. 4.

*Washington, 10 June, 1847.*

*Dear Sir,*—During the last winter, I was authorized by *Mr. Wayman* to sell three tracts of land, situated in *Allegany*, containing near sixteen thousand acres, at 50 cents per acre, for which he was to allow me a commission of 4 per cent. on the sale. On the 16th April, I wrote to him that I had made a sale, subject to the examination of the party, and that he must hold himself in readiness to make the deed. On the 24th May, I wrote to him through my son, saying, that the arrangement was concluded, and wished to know when and where he would receive the money. In reply, he wrote to me that you, as trustee, had sold the land to other parties, and in reply to a letter to you, you wrote to the same effect. I have since received letters from *Mr. Thomas* and *Mr. Markell*, saying that they had purchased from you. I have seen *Mr. Wayman*, and he will oppose the ratification of the sale made by you, and he requests me to report the sale made by me to you. I have sold the lands to *Benjamin E. Green* for fifty cents per acre, and he is prepared to pay the money as soon as the requisite deeds

are delivered. I write this that you may also report these facts, that the whole subject may be before the Chancellor.

Yours truly,

*George Schley, Esq.*                    DUFF GREEN.

The Chancellor passed an order of ratification *nisi* the 17th August, 1847.

The defendant, *Wayman*, excepted to the sale.

1st. Because the public were not properly advised of the title in the property thus sold, which the trustee had the power to sell. The trustee does not state in any of his advertisements the names of the parties to the suit in Chancery, or the date of the decree,—and as various deeds were executed by *James Cunningham*, and the trustee lived remote from the land, proper information could not be readily obtained, and especially as it did not appear by the said advertisements that the titles of your petitioner and *Richard G. Stockett*, mortgagees and trustees, were directed to be sold by the said decree.

The trustee, in his advertisement, states that he sells "the land of which *James Cunningham* died seized and possessed, &c." and not the title of the parties to the suit, as directed by the decree. Whereas, by the proceedings, it does appear that *Cunningham* had conveyed all this land, by deed of trust in his life-time, to your petitioner—the original of which deed is herewith filed.

2d. Because the trustee did not, in fact, sell all the interest of the parties, as by the decree he was bound to do, but sold only the interest and title of which *James Cunningham* died seized, as will appear by his report, and the contract of sale, exhibited with his report, and his letter to this petitioner, herewith filed.

3d. Because there was alleged to be an outstanding tax-title in some purchaser under the tax laws, which title your petitioner found, on consulting an attorney, was so defective as to be worthless; yet to prevent any supposed injury which a tax-title might cause in the contemplated sale, your petitioner had a legal tender of the taxes, and the premium and costs made in

due time and according to law, so as to entitle him to redeem the same, if it had been regularly sold, which tender was refused by the said tax purchaser, whereby your petitioner is advised that the right of the said tax purchaser, if any he had, was released, and the title became re-invested in the former owners, which information, in relation to the tender, &c. as above stated, this petitioner believes was unknown to the said trustee at the time of the sale, as will appear by the papers herewith filed, and which he intended to commmunicate before the sale thereof.

4th. Because this petitioner, by reason of the facilities afforded him, having for a long time been negotiating for the sale of this property, as he thought he had a right to do, with the approbation of the trustee, did, before the sale made by the trustee reported, actually contract for the sale of this land, at the rate of fifty cents an acre, for the quantity as called for by the patents, without survey, containing by the estimate about sixteen thousand acres—to *Benjamin E. Green* and *Duff Green,* or one of them; the cash to be paid at the ratification of the sale and the delivery of the deed, deducting therefrom five per cent. allowed the said *Duff Green* for making the sale thereof, as will appear by Exhibits H. W. Nos. 5, &c. and making the purchase money nearly $8,000, (all of which he thought he was doing with the approbation of the trustee,) whereas the trustee's sale was for only $3,000; that immediately on the communication of these terms of sale by *Green,* this petitioner made the same known to the said trustee, as he had done during the previous negotiations, and was surprised to hear that the trustee had made sale as aforesaid, to *Jacob Markell* and others, without any previous notice to this petitioner.

5th. Because this petitioner, in all his conversations and correspondence with the said trustee and *Francis Thomas,* one of the purchasers, and with all interested, had insisted on obtaining not less than fifty cents per acre—a sum which the property is fully and fairly worth, and made the same known to all the said persons.

6th. Because the said sale, as reported by the said trustee,

*was a private sale,* made without any notice given to the public generally, or to your petitioner in particular,—although your petitioner expected a public notice thereof; and although it was known to the said trustee, and to the said *Francis Thomas,* as your petitioner believes, that your petitioner was negotiating with the said *Green* for the sale of these lands, as will appear by reference to the trustee's report, and the exhibits herewith filed, marked Exhibits H. W. Nos. 2, &c.; that the court will ratify and confirm the sale, so as aforesaid made by the said *Henry Wayman* to the said *Duff Green,* after setting aside the sale, so as aforesaid reported by the said trustee.

7th. That the said *George Schley* has not executed a bond for the faithful performance of his duties as trustee, according to law and the terms of the said decree—the paper filed by the said *George Schley* having no stamp thereon.

8th. Also, because, since the offer to purchase made to the trustee by *Jacob Markell* and others, as reported, the *Baltimore and Ohio Rail-road Company* have fixed on their *western terminus,* and are about to prosecute the continuance of their *Rail-road* to the *Ohio* river, which road will pass near, if not through the lands for which the offers aforesaid were made, and thereby has, since said offers, greatly increased the value of said lands.

Exhibit H. W. No. 1, was the indenture made on the 21st October, 1835, between *James Cunningham* and *Catherine Cunningham,* his wife, of the one part, and *Henry Wayman* of the other part, for the trust under which the decree passed.

The record contained letters from *Geo. Schley,* the trustee, to *Henry Wayman;* from *Duff Green* to *F. H. Thomas,* interested in the purchase from *Thomas* to *Green* and *Wayman;* a contract of the 9th June, 1847, between *Wayman* and *Green,* for the sale of the land, with the conditions of such sale. Letters from *Green* to *George Schley;* all which are sufficiently adverted to in the opinion of the Chancellor in this cause.

The trustee, *George Schley,* in reply to the first objection to the ratification of his sale, stated that by reference to his report and accompanying vouchers, it will appear that the sale of the

land of *James Cunningham*, deceased, was advertised in four newspapers; two in the county where the lands were situate, one in *Washington* County, and one in the City of *Baltimore*. The trustee deemed the notice of sale sufficiently diffused by the extended circulation of these papers. The advertisement offered for sale the real estate, (or so much thereof as might be necessary for the payment of debts,) of which *James Cunningham* died seized and possessed, situate in *Allegany* County. The decree directed, that the real estate of *James Cunningham*, deceased, in the proceedings mentioned, or so much thereof as might be necessary for the payment of his debts, should be sold. It will be perceived that the advertisement is "*ad idem*" with the decree, and in compliance therewith, your trustee admits that the idea that it was necessary for him to state in his advertisement the names of the parties to the suit, and the date of the decree, has never been diffused as widely as his notice of said sale. The novelty of the objection attracted the attention of this respondent to the various notices of sale, under decrees of the High Court of Chancery, to be found in the *Baltimore* papers; and in no instance has he been able to find the names of the parties, and the date of the decree stated. Upon consultation with some of the oldest practitioners in said court, he discovered that the idea aforesaid was as novel to them, as it confessedly is to this respondent.

2D OBJECTION.—In reference to this objection, the trustee states now, as already stated in his report, that objection was made by the purchaser to your trustee determining the number of acres of land by the number expressed in the patents, and that further difficulty was made, because of the cloud hanging over the title, by reason of the claim of title under a sale made by the collector of taxes of *Allegany* County. To guard against all difficulty, either as to title, or number of acres, your trustee proposed to sell *Cunningham's* interest, as contra-distinguished from any claim of title to be asserted by strangers, or abatement of price, to be claimed because of deficiency of number of acres, conceiving that he was in this mode selling all he was authorized by said decree to sell,

most beneficially for said estate; and the purchaser being all the while under the impression, that he was buying all that said decree authorized to be sold. In making the sale in the mode he did, your trustee was governed, in great measure, by the suggestions of an experienced and distinguished solicitor, as will appear by the letter, herewith filed, marked G. S. No. 1.

3D OBJECTION.—The facts set forth in this objection are novel to the trustee, except that he had heard that one or more attorneys had pronounced said sale defective.

4TH OBJECTION.—Your trustee most positively and emphatically denies any communication on the part of *Mr. Wayman,* of a sale made by said *Wayman* to *Green, until after your trustee had made the sale reported by him,*—and he herewith exhibits, as part of this answer, the only letter he received from said *Wayman* prior to said sale, on the subject of a purchase by said *Green* of said lands. Your trustee also exhibits, as part of this, his answer, a letter from said *Wayman,* which sufficiently explains why the trustee was ignorant of the offer of *Green,* until it was too late to accept it.

5TH OBJECTION.—Your trustee has answered this objection in his report, and he refers your Honor to it, as containing his views of the value of said lands.

6TH OBJECTION.—In answer to this objection, your trustee refers to the printed notices of *private sale* accompanying his report.

The said trustee, further answering, says that the said sale was made by him under the belief at the time, that it was the highest price he could get for the lands, *after having in vain tried to sell at public sale, and after having advertised them for months in the newspapers at private sale, without an offer.*

That the said sale was, as far as he was concerned, a fair and *bona fide* sale, and one that he supposed at the time he made it, would be regarded and treated by this court as binding and obligatory on all the parties as if it had been made under the hammer, when he first offered the property at public sale. If, however, he is mistaken in this, and the said sale should be set aside, he will then proceed to offer the said land for sale

again, in such manner as this Honorable Court shall order and direct.

The objections to the ratification of the sale were further answered in detail by *Jacob Markell* and *Francis Thomas*, parties interested in the purchase. They filed a large number of letters, to which no further notice need be paid than what is contained in the Chancellor's opinion.

The letters were all admitted to be originals.

The exceptions to the sale having been heard, the Chancellor, (JOHNSON,) on the 10th September, 1847, delivered the following opinion:—

On the 6th December, 1842, a creditor's bill was filed in this court by *Gibbes and others*, as the executors of *Robert Oliver*, the administrators of *Horatio McPherson*, and the administrators of *John McPherson*, against the heirs of *James Cunningham*, who died in November, 1835, for the sale of his real estate, the personal being insufficient to pay his debts. The said real estate was stated in the bill to consist of a tract called "*Glen Eyry*," a tract called "*Latent Worth*," and a tract called "*Muddy Creek*," lying in *Allegany* County in this State; one other tract called "*Cheviot Dale*," and other parcels of land in this State.

It was alleged in the bill, that *Cunningham* in his life-time had executed a mortgage of a portion of his lands to *Henry Wayman* and *Richard G. Stockett;* but of what portion, or for what purpose, the complainants did not know. That on the 21st October, in the year 1835, he, *Cunningham* and wife, executed a deed of trust to the said *Wayman*, but that the trustee had neglected and refused to execute the trusts in any manner.

The heirs of *Cunningham*, his personal representatives, and *Stockett* and *Wayman*, were made parties defendants.

The deed from *Cunningham* and wife to *Wayman*, conveys to the latter the before mentioned tracts of land, lying in *Allegany* County, of which "*Latent Worth*" is said to contain ten thousand seven hundred and sixty-one acres, more or less; "*Glen Eyry*" four thousand six hundred and twenty-four acres;

and "*Muddy Creek*" five hundred and sixty-five acres, more or less; and the trusts are, that *Wayman* and his heirs may raise by a sale of the property as much money as will pay the debts for which he is liable as the surety of *Cunningham*, in the first place—then to reimburse him for such sums as he may advance for the said *Cunningham*—then to pay such other debts as the said *Wayman* may consider just and equitable—then to pay the expenses of the trust—and lastly, to pay over the surplus to the grantor, his heirs, executors or assigns.

Upon this bill, the Chancellor, on the 13th April, 1846, passed a decree, directing that the real estate of *James Cunningham*, deceased, in the proceedings mentioned, or so much thereof as may be necessary for the payment of his debts, be sold, and appointing *George Schley*, of *Washington* County, trustee, to make the sale. This decree is in common form, first requiring the trustee to give bond, and then to sell, after giving three weeks notice of the sale, as usual.

The trustee gave the prescribed bond, which is dated on the 29th April, 1846; but which was not filed and approved until the 7th of the then following July.

On the 17th June last, the trustee's report of his proceedings under the decree was filed. In this it is stated, that having bonded as required by the decree, and having advertised the said lands for sale as therein required, in two newspapers in *Cumberland*, one in *Hagerstown*, and one in *Baltimore*, he attended, pursuant to the notice, at *Cumberland*, on the 8th September, 1846, and offered the lands for sale; that he was then notified of a claim of title to "*Latent Worth*," growing out of a sale of the same by the collector; that the highest bid he could get for said tract was *five* cents per acre. For "*Glen Eyry*" but *six* cents was bid, and for "*Muddy Creek*" *twenty-six* cents per acre was the best bid, which bids the trustees refused to take, and consequently, no sale was made at that time.

That shortly afterwards, he re-advertised the land in the two *Cumberland* papers, to be sold at private sale, and although the advertisement had been continued from that period to the date

of the report, but one proposal had been made for a purchase, which the trustee accepted by entering into a written contract with the purchaser, filed with the report, from which it will appear that he had sold the right and estate of *James Cunningham*, deceased, in the lands, to *Jacob Markell*, for the gross sum of $3,000, to be paid in cash, upon the purchaser being notified by the trustee of the final ratification of the sale.

The trustee then proceeds to state in detail the reasons which induced him to sell so large a number of acres, for nominally so small a sum, which reasons were satisfactory to his mind, conducting him to the conclusion that he could not effect a better sale.

The trustee further states, that on the 22d December, 1846, the defendant, *Wayman*, wrote him, stating that he had received a letter from a certain *Duff Green*, of *Washington* City, enquiring about these lands, as he wished to purchase them for a Northern Company, and to know the lowest price for them; that *Wayman*, in answering the letter, had fixed the price at *fifty* cents, which he thought had better be taken, if such a sale could be made by the trustee or the writer; that the trustee replied, expressing his readiness to receive and consider any proposition for a purchase from said *Green*, and desiring *Wayman* so to say to *Green;* but from that time to the 24th May, 1847, nothing was heard from either *Wayman* or *Green*—that on that day, he received a letter from *Benja. E. Green*, marked T. R. No. 3, and filed with the report—and afterwards another letter from *Duff Green*, dated the 10th June, 1847, also filed, marked T. R. No. 4.

The agreement between the trustee and *Markell*, signed and sealed by them referred to, and filed with the report, is dated the 15th *May*, 1847, and states that *Schley* agrees to sell to *Markell*, all the estate, right, title and interest of the said *James Cunningham*, deceased, of, in and to the said lands, viz: "*Glen Eyry*," "*Latent Worth*" and "*Muddy Creek*," for the sum of $3,000—the sale to be subject to the approval of the court, and the money to be be paid upon the ratification—the interest, right, title and estate of *Cunningham* to be conveyed

by the trustee upon the payment of the purchase money, as stipulated by *Markell;* and then by way of further description of the lands sold, and not as a guarantee of their area or contents, it is stated in the contract that they are supposed to contain the quantity of acres already mentioned.

In the trustee's advertisement of the public sale, to take place on the 8th September, 1846, he says, that by virtue of a decree of the High Court of Chancery of *Maryland,* I will offer at public sale in *Cumberland,* on Tuesday, the 8th September next, between the hours of 10 A. M. and 4 P. M. the following valuable real estate, (or so much thereof as may be necessary for the payment of debts,) of which *James Cunningham* died seized and possessed. The lands are then described as lying west of *Cumberland,* at no great distance from the *Western* or *National Road,* and form a portion of that country, usually styled " *The Glades,*" and by their names and the number of acres already stated, as being contained in each tract.

Purchasers are then invited to call on *Mr. William Cunningham,* who is stated to reside thereon, who will shew the lands; and the terms of sale, as prescribed by the decree, are then given, to wit: one-third cash on the day of sale, or its ratification, and the residue in one and two years from the day of sale; and upon these terms, they are advertised to be sold.

This advertisement appeared for the first time in the *Hagerstown* paper, on the 10th August, 1846, and from thence it was copied into other papers, as therein directed.

In the advertisement of the private sale, which appeared in the *Cumberland* papers for the first time on the 10th November, 1846, the same description is given of the lands, and it corresponds, in all respects, with the previous advertisement, except that the trustee says he will offer the lands at private sale, having failed to sell at public sale.

On the 28th June, 1847, *Henry Wayman* and the heirs of *James Cunningham,* filed exceptions to the ratification of the sale reported by the trustee upon various grounds; and upon the same day an order was passed, fixing the first day of the

present month for the hearing.    Upon notice being served upon the parties in interest and upon the trustee, the trustee and two of the parties, to wit: *Markell,* the purchaser, and *Francis Thomas,* who it appears was concerned in the purchase, have answered, and a correspondence, to some extent, between the several persons concerned, and the trustee, has been filed, and upon the said exceptions and answers, and this correspondence, the case has been argued.    The letters are admitted to be genuine, and to have the same effect as if regularly proved under an order; but facts affirmed in these letters are not admitted by the purchasers, and are excepted to.    It would occupy too much space to recapitulate the facts and averments contained in the answers to the exceptions and the correspondence.    The Chancellor has read the papers with the utmost care, and will, in the observations he is about to make upon the exceptions to the sale, state the result to which his mind has been brought, by a deliberate consideration of the whole case.

The first objection taken to the sale is, that the public were not properly advised of the title in the property thus sold, which the trustee had the power to sell.

This objection rests upon the supposition, that the trustee should have stated in his advertisement the names of the parties to the suit in wnich the decree passed, and the several deeds creating incumbrances upon the property.

The decree, it will be recollected, directs that the real estate of *James Cunningham,* deceased, in the proceedings mentioned, or so much thereof as may be necessary to pay his debts, be sold.    It does not say in terms, that the title of the parties to the suit shall be sold, though no doubt a sale under the decree would pass such title.

The language of the advertisement is:—

By virtue of a decree of the High Court of Chancery, there will be sold certain real estate, naming the tracts, and giving their locality, of which *James Cunningham* died seized and possessed.    It does not say his title alone will be sold, but the lands of which he died seized and possessed.    The public

was notified by this advertisement that these lands were to be sold under a Chancery decree, to which decree, of course, there must be parties; and I am of opinion, that in the absence of evidence, that competition in the purchase was prevented by the character of the advertisement, or that the sale was, in any respect prejudiced thereby. It seems to me it should not on this account be vacated. A reference to the Chancery proceedings, to which the public was directed, would have shown who were the parties, and what title was to be sold. The trustee's advertisement referred to the fountain of his authority—described the lands to be sold by name and locality, and gave such other information respecting them as would enable persons disposed to purchase to ascertain all that it was material they should be informed of.

The Chancellor does not think, from an examination of the forms of advertisements of Chancery sales usually employed, that such precision as is insisted upon by the counsel for the parties objecting to this sale, has been supposed to be necessary.

The second objection is, that the trustee did not, in fact, sell the interest of the parties to the suit, but only the interest and title of which *James Cunningham* died seized.

The purchasers, in their answers to these exceptions, take a different view of the matter; but conceding that this exception states truly the nature and extent of the interest purchased by *Markell*, still this seems to be an objection, which only the purchasers themselves could take, as they, and they alone, are injured by it. Besides, it may not be unworthy of remark, that the sale reported by the trustee disposed of precisely that interest in the lands of which *Cunningham* died seized; and the answer of *Wayman* to the bill under which they were sold states, "that he died seized in fee of the several tracts of lands named and described in the bill of complaint."

The third objection has reference to the cloud upon the title, which, it is supposed, might readily have been removed; but which the trustee was not in a condition to remove, by reason of his ignorance of facts, known to *Wayman*, one of the objectors.

29    v.6.

This objection may, perhaps, be open to the observation, that if *Wayman* knew of any fact which would disperse the cloud which hung over the title, and omitted to communicate it to the trustee in due time, it does not become him, when a sale has been made, upon the ratification of which other parties interested in the proceeds are insisting, to interpose an objection upon that ground.

It is true that when a sale is objected to upon the ground of inadequacy of price, which inadequacy may be traced to doubts about the title, it becomes material to inquire whether the trustee might not, by reasonable efforts, have removed the cloud; and if the court can see that such efforts were not used, the question whether the sale shall, or shall not be ratified, may be affected by such neglect. *Glenn vs. Clapp,* 11 *Gill & Johns.* 1.

But from the very nature of the doubt about the title in this case, it was impossible that any diligence on the part of the trustee could remove it; the opinion of counsel might be taken upon the subject, but nothing short of the judgment of the court could solve the question.

It appears by the proceedings that the party who purchased for taxes, asserted, and was determined to maintain, the title thus acquired.

The fourth and fifth objections are based upon an alleged inadequacy of price, and upon negotiations carried on by *Mr. Wayman* for the sale of the property, which resulted as stated, in selling at a price much higher than the price obtained by the trustee; that inadequacy of price will not induce the court to vacate a sale, in other respects, unexceptionable, unless such inadequacy is so gross as to indicate a want of reasonable judgment and discretion in the trustee, was said by Court of Appeals in *Glenn vs. Clapp,* 11 *Gill & Johns.* 9.

It is material, therefore, to enquire whether the inadequacy of price in this case is so gross and palpable as to indicate a want of discretion and judgment on the part of the trustee. Looking to the bid made on the 8th September, 1846, when the lands were offered at public sale, as any criterion of the

price which could probably be obtained for them, and the sale reported surely cannot be condemned upon the grounds of inadequacy, since the sale reported is for a much larger sum than was offered at the public bidding.

But it is said, that although the price bid at the public offer of this property, was less than the sum which *Markell* and *Thomas* proposed to pay, yet the trustee had information that negotiations were pending, if not concluded, by *Wayman,* for a much larger sum,—and that under such circumstances, the trustee should have at least communicated with *Mr. Wayman* before he made a sale. The Chancellor thinks that the reasons assigned by the trustee for proceeding as he did, are satisfactory; and, indeed, *Mr. Wayman* himself confesses, that he, and not the trustee, was remiss in not giving information at the proper time; but is there any evidence that these lands are worth more, or that more could be obtained for them than *Markell* and *Thomas* have agreed to give? and emphatically, it may be asked, is there any evidence to show that a better price could have been had on the 15th May, 1847, the date of the sale?

The letter of *Duff Green* of the 19th August, 1847, with its conditions and qualifications, cannot be regarded as an offer; and yet it is the only one which has been made for the property, except such as may be found in the correspondence of the same party and his son with *Wayman;* and in the contract of the 9th June, 1847, between *Wayman* and *Green,* which besides containing stipulations which render it totally inadmissible, is, in effect, withdrawn by the letter of the 19th August last. In fact, though this property has been in the market, by advertisements in the newspapers, with very little intermission from August, 1846, to May, 1847, the offer of *Mr. Markell* is the only one to which any substantial character can be assigned, besides the almost nominal bid on the 8th September, 1846.

It is true *Mr. Wayman,* by a paper filed on the 7th instant, agrees to give $4,000 for the property, on the terms reported by the trustee; but this offer, in my opinion, cannot be allowed to have much weight in determining whether the property sold

previously at a price so much below its value, as to indicate a want of reasonable judgment in the trustee.

It is made after an event has happened, subsequent to the reported sale, which, in the opinion of many persons, has enhanced the value of the property. The Chancellor thinks as was said by the Court of Appeals in the case of *Tyson vs. Mickle*, 2 *Gill*, 384, that the validity or invalidity of the sale, must depend upon the state of circumstances existing at the time it was made. The clear equity of such a principle seems undeniable.

The sixth ground relied upon for not ratifying this sale is founded upon the manner in which it was made. It was a *private sale*, though the decree, which is in common form, directs a public one; for this deviation from the decree, it is supposed the sale must be condemned.

It is an admitted principle, that in sales made by the agency of trustees, acting under decrees of a Court of Chancery, the court is the contracting party on the one side, and the bidder on the other; the trustee being regarded as the mere agent or attorney of the court. I say this is the principle, though unlike all other contracts, one of the contracting parties is permitted to sit in judgment upon the contract, and pronounce upon its validity or invalidity. *Glenn vs. Clapp*, 11 *Gill & Johns.* 8. 2 *Bland*, 638, 639.

The principle, however, is understood to be incontestible, and as has been conceded in the argument. Chancellor *Hanson* has laid down the rule which should govern the court in deciding upon sales made under its authority. In the case of *Lawson vs. The State*, in 1804, he observed, "that reasons which would induce him, as proprietor or trustee, to set aside a sale made by his agent, should determine him, as Chancellor, to refuse his approbation to a sale made by a trustee.

It was decided by the late Chancellor, that if a trustee, directed to sell at public sale, does, notwithstanding, sell at private sale, the sale will be confirmed, if satisfactory reasons are given for doing so, and no objection is made. *Andrews vs. Scotton*, 2 *Bland*, 643.

The counsel by whom this case has been argued, have differed as to what was meant by the Chancellor when he speaks of no objection being made ; but my impression is, that he must have meant objections of sufficient force to outweigh the reasons given by the trustee for deviating from the terms of the decree; and that he could not have intended that reasons which would be satisfactory to him, in the absence of objections, should be overborne by the mere unsupported veto of any one looking to the court as the vendor, and the trustee as its agent, acting according to the terms prescribed by the former.  If, for reasons deemed sufficient by the court, the agent departs from the form in which he is to exercise his authority, who could have a right, merely upon the ground of such departure, to say that the principal should not ratify the act of its agent?

If the principle be sound, that the court is the vendor, and to be considered the proprietor of the thing to be sold, such a right of arbitrary interdiction on the part of any one cannot be maintained.

But it is to be recollected in this case, that the trustee did not undertake to sell these lands at private sale, until a fruitless effort had been made to dispose of them according to the terms of the decree; and that even after he had failed in this effort, they were constantly kept in the market by advertisements offering them at private sale.  It is not the case, therefore, of a trustee who has undertaken to depart from the terms of the authority under which he acts, without first making an effort to comply with them, but it is the case of a deviation from those terms, after an ineffectual endeavor to conform to them. It is also a circumstance very material to be considered, that the price at which the trustee had contracted to sell these lands greatly exceeds the best offer he could get for them when exposed to public sale ; and another very strong recommendation of the sale made is to be found in the circumstance, that the property was never withdrawn from the public eye, but kept always before it and in the market, by advertisements in the newspapers.

In *Tyson vs. Mickle*, 2 *Gill*, 383, a private sale made by a trustee, was confirmed by the court, though the amount of the private bid was considerably *less* than had been offered for the same property when exposed publicly ; and the court in that case say, that Chancery will always ratify an act when done, which upon a previous application would have been authorized. It is true that in the case of *Tyson vs. Mickle*, the parties interested consented to the sale ; but one of those parties, and one largely interested, was a minor, and therefore incompetent to consent. Adopting the principle of the Court of Appeals, that an act when done will be ratified, which the court, if applied to beforehand, would have authorized, I am of opinion, that the objection to the act of the trustee in this case, founded upon the form of the sale, cannot prevail; and it seems to me that upon an application, setting out all that had taken place prior to the sale to *Mr. Markell*, the trustee would have been authorized to accept his offer.

Whilst the Chancellor would consider it his duty to vacate sales made by officers of his appointment, under the influence of error, fraud, misrepresentation or injurious mistake, he nevertheless thinks that it would be a fatal policy to be astute in finding out objections to them. The impression of the court is, that they are entitled to the benefit of every fair and reasonable intendment,—and that a *bona fide* purchaser is not to lose the rights which he supposed he was acquiring when dealing with its agent upon objections founded upon the modal regulations of the sale—the non-observance of which is not shown to have been injurious. *Marshall's lessee vs. Greenfield*, 8 *Gill & Johns.* 349.

The 7th objection to the sale is because the trustee's bond is not upon stamped paper as required by the act of 1845, chap. 193. The law went into effect on the 1st May, 1846, and this bond, though dated on the 29th April, 1846, was not filed and approved by the Chancellor until the 7th July following.

The argument is, that the bond was of no effect until filed and approved ; those acts constituting its delivery and acceptance.

By adverting to the terms of the decree, it will be found that the trustee is to proceed to make sale of the property, upon giving bond in a certain penalty, and with sureties to be approved by the Chancellor, conditioned for the faithful performance of the trust reposed in him by the decree.

This bond has been approved by the Chancellor, and it seems to me it would be of dangerous consequence to say, that although thus approved, the purchaser shall not get the benefit of his purchase, if the bond, for any reason, is defective.

Few persons, I presume, would be disposed to bid at trustees' sales, if such a doctrine is to obtain. The Chancellor, for this reason, does not deem it necessary to express an opinion upon the point discussed by the counsel; but upon application to require the trustee to execute another bond, he will be prepared to do so.

Upon the remaining objection, my opinion has been already expressed, and need not be repeated, and I conclude, therefore, *that the objections filed to the sale in this case must be overruled,* though in view of all the circumstances of the case, the order will direct that the parties pay their own costs respectively. I have arrived at this conclusion, after considering the case with much attention, aided by the very full and able arguments of the counsel employed in it. If my judgment is erroneous, I am gratified to know that a superior court will correct the error.

From this decree, *Henry Wayman, William C. Cunningham,* and *Charles E. Cunningham* appealed to this court.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, SPENCE, MAGRUDER and MARTIN, J.

By ALEX. RANDALL and NELSON for the appellants, and By ALEXANDER and F. A. SCHLEY for the appellees.

By the court:

Decree of the Chancellor affirmed for the reasons stated by him.

DECREE AFFIRMED.